DEREK SMITH LAW GROUP, PLLC
CATHERINE W. LOWRY, ESQUIRE
Attorney ID No. 316291
1628 Pine Street
Philadelphia, PA 19103
(267) 857-0832
catherine@dereksmithlaw.com
*Attorneys for Plaintiff Jane Doe*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JANE DOE,<br><br>                    Plaintiff,<br><br>          v.<br><br>STADIUM CASINO RE, LLC; STADIUM CASINO RE, LLC d/b/a LIVE! CASINO & HOTEL; STADIUM CASINO RE, LLC d/b/a SPORTS & SOCIAL; RYAN SULLIVAN; and KARRI NELSON;<br><br>                    Defendants. | Civil Action No.<br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

## COMPLAINT

Plaintiff, Jane Doe, by and through her attorneys, the Derek Smith Law Group, PLLC, by way of this Complaint, state:

## NATURE OF THE CASE

1.  This action arises out of the unlawful discrimination, hostile work environment, intimidation, and retaliation by Defendants against Plaintiff based on her sex/gender and in retaliation for Plaintiff's opposition to the unlawful comments and conduct of the Defendants.

2.  Plaintiff brings this action charging that Defendants violated Plaintiff's rights pursuant to

1

Title VII of the Civil Rights Act of 1964 ("Title VII"), the Pennsylvania Human Relations Act, as amended, 42 U.S. §§ 951, et seq. ("PHRA"), and Pennsylvania Common Law.

3. Plaintiff seeks damages to redress the injuries she has suffered as a result of Defendants' actions.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, which gives district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

5. This Court has jurisdiction in that this action involves a Federal Question.

6. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

8. Pursuant to 28 U.S.C. §1391(b), venue is proper in this district based upon Defendants' residency and due to the fact that a substantial part of the events or omissions giving rise to the claim occurred within Philadelphia County, in the Commonwealth of Pennsylvania, within the Eastern District of Pennsylvania.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. On February 21, 2024, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and dual filed with the Pennsylvania Human Relations Commission ("PHRC") alleging violations of Title VII, the PHRA, and Pennsylvania Common laws.

10. Plaintiff requested that her Charge be simultaneously filed with any other Federal or State agency with whom the EEOC has a work sharing agreement.

11. On March 29, 2024, Plaintiff was issued a "Determination and Notice of Rights" letter by the EEOC.

12. Plaintiff has complied with all administrative prerequisites to bring this lawsuit.

13. Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

14. Plaintiff will seek leave to amend this complaint to assert her PHRA claims against the named parties referenced. *See* Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## PARTIES

15. Plaintiff, Jane Doe (hereinafter referred to as "Plaintiff"), is a Hispanic female residing in the State of New Jersey.

16.   Plaintiff Doe is referred to herein as Plaintiff Doe due to the extreme hardship such revelation of her identity would cause and the need to protect victims of sexual crimes.

17.   Defendant Stadium Casino Re, LLC (hereinafter referred to as "Defendant SCR"), is a corporation existing under the existing law of the State of Maryland.

18.   At all material times, Defendant SCR's primary place of business was 601 E Pratt Street, 6th Floor, Baltimore, MD 21202.

19.   At all material times, Defendant SCR was doing business as Live! Casino & Hotel Philadelphia (hereinafter referred to as "Defendant Live"), a casino and hotel.

20.   At all times material, Defendant Live's primary place of business was 900 Packer Avenue, Philadelphia, PA 19148.

21.   At all material times, Defendant SCR was doing business as Sports & Social (hereinafter referred to as "Defendant S&S"), a sports restaurant, gaming venue, and social lounge.

22.   At all times material, Defendant S&S' primary place of business was 900 Packer Avenue, Philadelphia, PA 19148.

23.   Hereinafter, Defendant SCR, Defendant Live, and Defendant S&S may collectively be referred to as "Corporate Defendants."

24.   At all relevant times, Corporate Defendants were continuously, and are currently, doing business in the Commonwealth of Pennsylvania and has continuously had at least fifteen (15) employees.

25.   At all relevant times, Corporate Defendants employers engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000 (e), (g), and (h).

26.   At all times material hereto, Corporate Defendants conducted business in Philadelphia

County, employing four or more persons within the Commonwealth of Pennsylvania, and

falls within the reach of the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955

(a).

27.   At all times material, Defendant Ryan Sullivan (hereinafter referred to as "Defendant

Sullivan") was the General Manager at Defendant S&S.

28.   At all times material, Defendant Sullivan held a supervisory position over Plaintiff.

29.   At all times material, Defendant Karri Nelson (hereinafter referred to as "Defendant

Nelson") was Assistant General Manager at Defendant S&S.[1]

30.   At all times material, Defendant Nelson held a supervisory position over Plaintiff.

31.   At all times material, Defendants were joint employers of Plaintiff.


## MATERIAL FACTS

32.   Around March/April of 2022, Plaintiff began working at Defendant S&S as a food server.

33.   During a significant amount of Plaintiff's employment, Defendant S&S was short a

General Manager.

34.   Around late June, Early July of 2023, Defendant Sullivan became a General Manager for

Defendant S&S.

35.   When Defendant Sullivan began working at Defendant S&S, there were rumors that

Defendant Sullivan had been fired from a previous job for consuming alcohol while

working.

---

[1] Defendant Nelson became General Manager at Defendant S&S around October/November of 2023.

5

36.     Around Defendant Sullivan's second or third week of working with Defendant S&S, he began to sexually harass Plaintiff by making inappropriate comments and engaging in inappropriate conduct.

37.     By way of example, Defendant Sullivan made comments to Plaintiff such as "oh you look beautiful" as he would stare at Plaintiff's chest.

38.     In addition, when Plaintiff would inform Defendant Sullivan that she was too busy and could not take on the additional tables, Defendant Sullivan would state "oh you spicy Latina."

39.     This caused Plaintiff to feel incredibly humiliated, embarrassed, degraded, victimized, and emotionally distressed.

40.     By way of further example, on various occasions, Defendant Sullivan would walk by Plaintiff, place his arm around her waist and state "excuse me baby."

41.     Plaintiff would immediately move away as it caused her extreme discomfort.

42.     Around July of 2023, Plaintiff was having a conversation with her coworker, Rebecca Last Name Unknown (hereinafter referred to as "Rebecca"), where Defendant Sullivan was brought up.

43.     Rebecca mentioned an incident when she was working on the computer system with Defendant Sullivan, and he swatted her hand away.

44.     Plaintiff informed Rebecca of the sexual harassment she was forced to endure at the hands of Defendant Sullivan.

45.     Plaintiff and Rebecca both discussed how inappropriate Defendant Sullivan was.

46.     Upon information and belief, thereafter, Defendant Nelson heard from staff members that Plaintiff was experiencing issues with Defendant Sullivan.

47. Defendant Nelson approached Plaintiff and inquired if she, Plaintiff, had any issues with Defendant Sullivan.

48. Plaintiff informed Defendant Nelson of the sexual harassment she had endured at the hands of Defendant Sullivan.

49. Defendant Nelson informed Plaintiff that she could go to Human Resources to report Defendant Sullivan.

50. However, Defendant Nelson's tone and mannerism left Plaintiff with the impression that Defendant Nelson did not want Plaintiff to report Defendant Sullivan to Human Resources.

51. Upon information and belief, Defendant Nelson did not want Plaintiff to report Defendant Sullivan because if Defendant Sullivan was terminated, her workload would increase.

52. Defendant Nelson later approached Plaintiff and informed Plaintiff that she believed that Defendant Sullivan's interactions with Plaintiff were just Defendant Sullivan's "personality" and based on the work environment of restaurants.

53. Defendant Nelson did not address Plaintiff's reports of sexual harassment any further.

54. This caused Plaintiff to feel incredibly humiliated, embarrassed, victimized, degraded, and emotionally distressed.

55. Around July 12, 2023, Plaintiff was speaking with her coworker, Dominique Last Name Unknown, in the kitchen of Defendant S&S.

56. Plaintiff had her arms slightly raised.

57. Defendant Sullivan walked by and proceeded to "tickle" Plaintiff by placing both of his hands under her arms, by the sides of Plaintiff's breasts, and touched Plaintiff's bra.

58.   Plaintiff immediately moved away as she felt incredibly violated, embarrassed, humiliated, victimized, and emotionally distressed.

59.   Around July 13, 2023, Plaintiff was working the evening shift.

60.   Defendant Sullivan was the manager on the shift with Plaintiff and had left the restaurant around 10:30-11:00 PM without taking the manager phone with him.

61.   During the shift, while Defendant Sullivan was out of the restaurant, Plaintiff needed assistance reopening a check and attempted to call Defendant Sullivan on the manger phone, only to realize that he had left it behind.

62.   As such, Plaintiff contacted the beverage phone number as she needed a manager urgently for the guests that were still in the restaurant.

63.   Shortly thereafter, Defendant Sullivan appeared, approached Plaintiff closely, and stated, "You wouldn't have had to wait this long if you just took down my phone number" and began to insist that Plaintiff take down his personal phone number.

64.   Plaintiff declined as she was incredibly uncomfortable with Defendant Sullivan due to the inappropriate comments and conduct he engaged in on regular basis.

65.   Around July 15, 2023, Plaintiff was working the dinner rush with Defendant Sullivan.

66.   During the shift, Plaintiff bent over to pick up trash from the floor and was unaware that Defendant Sullivan was a few steps behind her.

67.   Thereafter, Defendant Sullivan followed Plaintiff into the kitchen and informed Plaintiff that "seeing that made [Defendant Sullivan] very happy."

68.   Plaintiff asked what he had meant by that, and Defendant Sullivan stated he was leaving it open for interpretation.

69.   Upon information and belief, Defendant Sullivan meant that seeing Plaintiff bend over in front of him made him aroused.

70.   This caused Plaintiff to feel incredibly uncomfortable, humiliated, degraded, embarrassed, victimized, and emotionally distressed.

71.   Towards the end of the shift, Plaintiff was waiting in the kitchen for her last tables food to come out.

72.   Defendant Sullivan was in the kitchen also, and grabbed Plaintiff's right arm and said, "we're almost done!"

73.   Defendant Sullivan let go of Plaintiff's arm only to immediately grab it once more and shake it aggressively in the air as if to celebrate.

74.   Plaintiff at the time had a medical implant in her right arm.

75.   Due to the implant, Plaintiff's right arm was extremely sensitive to touch and shakes, and any such movement has the potential to trigger reactions from her body.

76.   Plaintiff immediately felt unwell, went to the bathroom, and proceeded to vomit because of Defendant Sullivan's tight grip on, and shaking of, her arm.

77.   Plaintiff refused to engage with Defendant Sullivan for the remainder of her shift except when necessary.

78.   Thereafter, Plaintiff reached out to another coworker to cover her shift the following day as she did not want to work with Defendant Sullivan.

79.   Around July 16, 2023, Plaintiff received a text message from Defendant Nelson asking Plaintiff to call her.

80.   Plaintiff called Defendant Nelson and Defendant Nelson inquired as to what took place on July 15, 2023, with Defendant Sullivan.

81.    Plaintiff informed Defendant Nelson and Defendant Nelson advised Plaintiff to write down what occurred.

82.    Thereafter, Plaintiff had a few days off work as she had a pre-planned vacation.

83.    Shortly after Plaintiff returned to work from her vacation, Defendant Sullivan was terminated from Defendant S&S.

84.    Upon information and belief, Defendant Sullivan was terminated unrelated to his constant sexual harassment of Plaintiff.

85.    Thereafter, Defendant Nelson began to treat Plaintiff negatively and retaliate against her.

86.    Upon information and belief, Defendant Nelson believed Plaintiff's reports about Defendant Sullivan played a role in his termination.

87.    Upon information and belief, Defendant Sullivan's termination resulted in more work and shifts for Defendant Nelson.

88.    Defendant Nelson made comments to other staff members that Plaintiff was working for Defendants because she was "just a pretty face" and Defendant Nelson permitted customers of Defendants to make comments about the restaurant needing pretty girls to look at.

89.    In addition, Defendant Nelson would predominately seat Plaintiff with male only tables, even when it was not Plaintiff's turn to receive a table.

90.    Furthermore, Defendant Nelson would have Plaintiff take tables outside of the section that Plaintiff was assigned if the tables were made up of all males.

91.    This caused Plaintiff to feel incredibly humiliated, embarrassed, degraded, victimized, and emotionally distressed.

92.   Around October/November of 2023, Plaintiff inquired with Defendant Nelson about the "shot girl" position that was open.

93.   Defendant Nelson informed Plaintiff that if she wanted to work in this position, she would have to wear the new uniform that would be tight and the women's butt cheeks would be hanging out.

94.   Plaintiff informed Defendant Nelson that if this tight uniform was a requirement, she would not be interested.

95.   Thereafter, the position was filled by another individual and that individual was not required to wear the tight uniform.

96.   This position would have resulted in higher pay for Plaintiff and would have resulted in more shifts Plaintiff could work.

97.   Upon information and belief, Defendant Nelson lied to Plaintiff about the uniform as she did not want her to have the position as she previously reported Defendant Sullivan for sexual harassment.

98.   Defendant Nelson continued to make the working environment unbearable after she reported Defendant Sullivan for sexual harassment.

99.   On December 3, 2023, as a result of Defendant Nelson's continued hostility and retaliation, Plaintiff felt as though she had no other choice but to resign from Defendants.

100.   The above are just some examples of some of the discrimination and retaliation to which Defendants subjected Plaintiff on a continuous and on-going basis throughout Plaintiff's employment.

101.   As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

102.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

103.   Plaintiff has further experienced severe emotional and physical distress.

104.   Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition(s).

105.   Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

106.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against all the Defendants jointly and severally.

107.   Plaintiff claims actual discharge as a result of the unlawful discrimination and retaliation and seeks reinstatement.

108.   The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

109.   Plaintiff claims that Defendants unlawfully discriminated against Plaintiff because of her sex/gender.

110.   Plaintiff claims alternatively that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that

Defendants owed and breached its duty to Plaintiff to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

**COUNT I**
**DISCRIMINATION**
**TITLE VII**
**(By Plaintiff against Corporate Defendants)**

111.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

112.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex/gender.

113.    SEC. 2000e-2. [Section 703] states as follows:

  (a) Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for

employment in any way which would deprive or tend to deprive any individual of

employment opportunities or otherwise adversely affect his status as an employee,

because of such individual's race, color, religion, sex, or national origin.

114.     Defendants engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her sex/gender.

115.     Defendants subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

116.     Plaintiff's protected characteristics (sex/gender) played a determinative factor in Defendants' decisions.

117.     Defendants cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

118.     Alternatively, Plaintiff's protected status played a motivating part in the Defendants' decisions even if other factors may also have motivated its actions against Plaintiff.

119.     Defendants acted with the intent to discriminate.

120.     Defendants acted upon a continuing course of conduct.

121.     As a result of the Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

<u>**COUNT II**</u>
**HOSTILE WORK ENVIRONMENT**
**Title VII**
**(By Plaintiff against Corporate Defendants)**

122.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

123.     Title VII also prohibits hostile work environment harassment, defined as

unwanted comments or conduct regarding the Plaintiff's protected characteristics that

have the purpose or effect of unreasonably interfering with the terms and conditions of

the Plaintiff's employment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

124.     An employer is strictly liable for supervisor harassment that "culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment."

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

125.     Respondeat superior liability for the acts of non-supervisory employees exists

where "the defendant knew or should have known of the harassment and failed to take

prompt remedial action." *Andrews v. city of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir.

1990).

126.     Employer liability for co-worker harassment also exists where "the employer

failed to provide a reasonable avenue for complaint." *Huston v. Procter & Gamble Paper

Prods. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009).

127.     The Third Circuit has held that the retaliation provision of Title VII "can be

offended by harassment that is severe or pervasive enough to create a hostile work

environment." *Jensen v. Potter*, 435 F.3d 444, 446 (3d Cir. 2006).

128.     Here, Defendants' conduct occurred because of Plaintiff's legally protected

characteristics and was severe or pervasive enough to make a reasonable person of the

same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

129.     The discriminatory conduct directly refers to Plaintiff's sex/gender.

130.     Plaintiff's supervisors had the authority to control Plaintiff's work environment, and they abused that authority to create a hostile work environment.

131.     Derogatory and sexually explicit harassing conduct and comments filled the environment of Plaintiff's work area.

132.     Defendants knew that the derogatory and sexually explicit harassing conduct and comments filled Plaintiff's work environment.

133.     The derogatory and sexually explicit harassing conduct and comments occurred on an almost if not daily basis.

134.     The derogatory and sexually explicit harassing comments and conduct caused Plaintiff to sustain severe emotional distress resulting in physical illness.

135.     Plaintiff subjectively regarded the derogatory and sexually explicit harassing comments and conduct as unwelcome, unwanted, and she objectively opposed the conduct.

136.     The conduct was both severe and pervasive.

137.     The conduct was emotionally damaging and humiliating.

138.     The conduct unreasonably interfered with Plaintiff's work performance.

139.     The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

140.     The Defendants provided a futile avenue for a complaint.

141.     The Defendants retaliated against Plaintiff for her complaints.

142.     The Defendants acted upon a continuing course of conduct.

143.     As a result of the Defendants' violations of Title VII, Plaintiff has suffered

damages including but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress,

reputational harm, diminishment of career opportunities, and other harm, both tangible

and intangible.

**COUT III**
**RETALIATION**
**TITLE VII**
**(By Plaintiff against Corporate Defendants)**

144.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

145.     Title VII protects employees from retaliation for attempting to exercise their

rights under the Act:

42 U.S.C. § 2000e-3. Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or

participating in enforcement proceedings. It shall be an unlawful

employment practice for an employer to discriminate against any of

his employees . . . because [she] has opposed any practice made an

unlawful employment practice by this subchapter, or because [she]

has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this subchapter.

146.     The Supreme Court in *Burlington v. N. & S.F. Ry. V. White*, 548 U.S. 53, 68

(2006) held that a cause of action for retaliation under Title VII lies whenever the

employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

147.     Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.")

148.     "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993); and *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by *Miller v. CIGNA Corp.*, 47 F.3d 586 (3d Cir.1995).

149.     Here, Defendants discriminated against Plaintiff because of her protected activity under Title VII.

150.     Plaintiff acted under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex/gender was violated.

151.     Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

152.     There was a causal connection between the Defendants' materially adverse actions and Plaintiff's protected activity.

153.     Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

154.     Defendants acted upon a continuing course of conduct.

155.     Plaintiff will rely on a broad array of evidence to demonstrate a causal link

between her protected activity and the Defendants' actions taken against her, such as the

unusually suggestive proximity in time between events, as well as Defendants'

antagonism and change in demeanor toward Plaintiff after Defendants became aware of

Plaintiff's protected activity.

156.     As a result of Defendants' violations of Title VII, Plaintiff has suffered damages,

including, but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress,

reputational harm, diminishment of career opportunities, and other harm, both tangible

and intangible.

**COUNT IV**
**DISCRIMINATION**
**PHRA § 955**
**(By Plaintiff against Defendants Sullivan and Nelson)**

157.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

158.     Plaintiff's PHRA claims are still pending before the PHRC.

159.     Plaintiff will seek leave to amend this complaint at the appropriate time to assert

her PHRA claims against Defendants. *See* Federal R. Civ. P. 159a) (Courts "freely give

leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date

of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting

out any transaction, occurrence, or event that happened after the date of the pleading to

be supplemented").

**COUNT V**
**AIDING AND ABETTING**
**PHRA § 955(e)**
**(Plaintiff against Defendants Sullivan and Nelson)**

160.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

161.     Plaintiff's PHRA claims are still pending before the PHRC.

162.     Plaintiff will seek leave to amend this complaint at the appropriate time to assert her PHRA claims against Defendants. *See* Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

**COUNT VI**
**Retaliation**
**PHRA § 955(d)**
**(Plaintiff against All Defendants)**

163.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

164.     Plaintiff's PHRA claims are still pending before the PHRC.

165.     Plaintiff will seek leave to amend this complaint at the appropriate time to assert her PHRA claims against Defendants. *See* Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.


## DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to her claims alleged herein, her claims to damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress, back pay, and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff Jane Doe*

By: */s/ Catherine W. Lowry, Esq.*
Catherine W. Lowry, Esq.
1628 Pine Street
Philadelphia, Pennsylvania 19103
Dated: June 24, 2024                    (267) 857-0832